# United States Court of Appeals

## For the First Circuit

No. 00-2097

UNITED STATES OF AMERICA,

Appellant,

v.

JOHN MORAN and NORA MORAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

Greenberg,* Senior Circuit Judge.

Christopher L. Varner, Assistant United States Attorney, with whom Michael Sullivan, United States Attorney, was on brief for appellant.
Francis J. DiMento with whom DiMento & Sullivan was on brief, for appellee, John M. Moran.
Kenneth J. Fishman with whom Peter Charles Horstman, Julie A. Hamon and Fishman, Anker & Horstman were on brief for appellee, Nora Moran.

_____

September 23, 2002

_____

_____
    *Honorable Morton I. Greenberg, of the Third Circuit, sitting by designation.

**Greenburg, Senior Circuit Judge**.   This case comes on before this court on appeal from a July 13, 2000 memorandum and order of the district court entering a judgment of acquittal for defendants-appellees John Moran and Nora Moran after their jury convictions for bank fraud and conspiracy to commit bank fraud under 18 U.S.C. §§ 1344 and 371.  Granting appellees' Fed. R. Crim. P. 29 motions one year after the jury returned the verdicts, the court concluded that the evidence the government submitted in its case-in-chief was insufficient to sustain the convictions.  The government challenges that determination on appeal, arguing that the district court erred in failing to consider the full trial record before granting the motions.  The government contends that the evidence, viewed in its totality and with all reasonable inferences drawn in the government's favor as the verdict winner, supported a finding beyond a reasonable doubt that the Morans each knowingly engaged and conspired to engage in a scheme to defraud a federally insured banking institution by actively concealing material information concerning their outside interests in Boston real-estate development projects secured by two loans made by the institution.  For the reasons set forth below, we agree with the government and will reverse the judgment of the district court, reinstate the guilty verdicts, and remand the case to the district court for further proceedings.

## I.   BACKGROUND

A brief summary of the salient facts follows, though we

reserve making a more detailed exposition until we set forth our legal analysis. This appeal grows out of a superseding indictment charging the Morans with bank fraud and conspiracy in connection with two loans the First American Bank for Savings (First American), a federally insured institution, made in December 1986 to real-estate developers Edgar Puente and David Boersner. Puente and Boersner needed financing for two renovation projects seeking to transform brownstone and apartment buildings on Commonwealth Avenue and in West Rutland Square in Boston into condominiums.

John Moran, who for many years on numerous occasions had represented First American as a conveyancing attorney, met with Puente and Boersner in October 1986 to discuss serving as their mortgage broker. Puente and Boersner hired John Moran in that capacity under the self-styled "Moran Holdings," agreeing to pay him a fee equal to 1.5% of any loans he successfully procured for their projects. John Moran subsequently arranged and attended a meeting with Puente, Boersner, and a loan officer at First American, Edmund Noke, which culminated in the parties' agreeing that First American would extend two loans totaling $17 million to Puente and Boersner in exchange for a 40% profit interest in the development projects. The parties further agreed that John Moran would act as the closing attorney for the bank on the loans. In a separate agreement, not involving Noke, Puente and Boersner agreed to give John Moran a 20% profit interest in the projects to be held

by the Moran Development Group (MDG) Trust, established by Nora Moran, its sole trustee, on December 15, 1986.[1]

Nora Moran, who at all times relevant to this appeal was a real-estate broker and the wife of John Moran, was on the Board of Directors of First American, having assumed the office on August 21, 1986.[2] First American had adopted a Code of Professional Ethics in 1979 requiring, inter alia, that an officer or director disclose any direct or indirect financial interest in a bank loan and disqualify him or herself from participating in the approval process for any such loan. This requirement was consistent with Regulation "O" of the Federal Reserve Board, 12 C.F.R. § 215, which, pursuant to 12 U.S.C. § 375a(10), requires interested directors to disclose fully any personal financial stake or that of their related entities in a given loan and prohibits them from participating directly or indirectly in any vote to extend such credit. The regulation also requires banks to keep records of insider loans to directors, officers, and their related interests and to report annually all insider loans to federal regulators. See 12 C.F.R. §§ 215.7 and 215.9.

In November 1986, the Morans, Noke, Puente, Boersner, and a representative of Contractors Funding Corporation, a company

[1]John Moran's interest was 20% of the share retained by Puente and Boersner, or 12% of the total profit interest.

[2]Nora Moran was a trustee of the bank from March 1985 until July 1986, when it changed its organizational structure to provide, inter alia, that it would have a Board of Directors rather than a Board of Trustees. We use the terms trustee and director interchangeably.

-4-

specializing in construction inspection services, visited the Commonwealth Avenue and West Rutland Square project sites. John Moran subsequently submitted formal, written proposals on behalf of Puente and Boersner seeking non-recourse loans for the projects (which, as opposed to recourse loans, insulate borrowers from personal liability for the amount of the loans). The proposals carried the name Moran Holdings and were signed by John Moran, but did not mention his brokerage or profit arrangement with Puente and Boersner.

Noke sent memoranda summarizing the loan proposals to First American's Executive Committee in December 1986, as all loans for amounts greater than $500,000 required its approval. These memoranda did not mention John Moran's brokerage or profit arrangement with Puente and Boersner. The Executive Committee approved the loans on a recourse basis on December 17, and they closed on December 23 and 24.[3] John Moran represented the bank at the closings, charging $35,500 for his services although he in fact collected only $30,500 on the fee. He also received $255,000 in mortgage brokerage fees from the proceeds of the loans. Furthermore, John Moran kept an additional $52,000 in bank funds in his checking account, which should have been disbursed at the closings.

---

[3]Though it is not essential to our analysis that we do so, we note that the district court cited the discrepant closing date of December 26 for the Commonwealth Avenue project loan, by way of reference to documentation submitted by John Moran to the bank in January 1988. The parties agree and all the other evidence on record indicates, however, that the loan closed on December 24, 1986.

On January 15, 1987, the Board of Directors, with Nora Moran in attendance, met to consider an agenda which included a report of the Executive Committee's activities for December 1986. Minutes from a December 17 meeting of the Executive Committee show that two votes were taken, one approving 140 loans totaling $31,098,750 and another approving 13 additional loans totaling $58,961,000 with the Puente/Boersner loans included in the latter group. The Executive Committee's report to the Board, however, included details concerning only the vote on the 140 loans. Nevertheless, the government argued at trial and argues on this appeal that the Board voted to approve the Puente/Boersner loans at the January 15 meeting and that Nora Moran, rather than disqualifying herself because of her financial interest, voted in favor of the loans. Notwithstanding their dispute over what happened at the Board meeting on January 15, 1987, the parties agree that Nora Moran never disclosed to any employee, officer, or agent of First American her husband's status as the mortgage broker for Puente and Boersner or his profit interest in their development projects.

Following the closings, John Moran did not file settlement statements with the bank, forms customarily signed by all the parties and submitted within 30 days accounting for the use of the loan proceeds. Moreover, he did not submit any records documenting his mortgage brokerage arrangement, his 20% interest in the project, or his retention of the additional $52,000 in bank funds. Furthermore, he did not disclose that he used a portion of

that money in April 1987 to pay off a loan that Puente and Boersner had secured from Olympic International Bank & Trust Company (where John Moran served as a director) as a down payment towards the purchase of the West Rutland Square property.

In 1988, First American vice president and general counsel Michael Hanson reviewed the files on the Puente/Boersner projects because the loans were not performing[4] satisfactorily and discovered that the settlement statements were missing.  After he eventually obtained copies of the statements, Hanson realized that signatures were absent from them and that balances were unaccounted for.  He learned also that John Moran had received mortgage brokerage fees from the loan proceeds.  Finally, Hanson discovered that John Moran had obtained a 20% profit stake in the Puente/Boersner projects which he expected to satisfy by securing a penthouse apartment in one of the buildings.  These understandably disturbing revelations caused Hanson to contact the bank's outside attorneys, the firm of Warner & Stackpole, regarding the Puente/Boersner loans.

On May 3, 1988, Warner & Stackpole attorneys Stanley Ragalevsky and Samuel Adams met with John Moran and Nora Moran for approximately two hours.  According to the memorandum regarding the meeting that Ragalevsky and Adams submitted to First American after the Morans approved it, Nora Moran admitted that she had been aware of her husband's brokerage and profit arrangement by the time the

_____

[4]In banking jargon, when required payments are not made on a loan it is said to be "performing" unsatisfactorily.

-7-

loans were approved. She also admitted that she never volunteered this information to anyone at the bank, believing that her husband had made the appropriate disclosures. John Moran claimed that he had made full disclosure of his interest in the ventures to Noke and had given up his interest in the properties. As a consequence of the disclosures in the memorandum and the facts revealed by the related investigation, Nora Moran was asked to resign her director position from the First American Bancorp, Inc., the bank's holding company to which she had moved from the bank proper. The Board of Directors of Bancorp accepted her resignation on June 30, 1988. By October 1990, First American failed and was closed by the FDIC.

On July 9, 1997, a grand jury returned a superseding indictment against John and Nora Moran for bank fraud under 18 U.S.C. § 1344, aiding and abetting bank fraud under 18 U.S.C. § 2, and conspiracy to commit bank fraud under 18 U.S.C. § 371.[5] Specifically, counts two and three of the indictment charged that John Moran as a closing attorney for First American and Nora Moran as a director of First American committed fraud when, though duty-bound to do so, they failed to disclose their material profit interest in the projects when the $17 million mortgage loans were issued. With respect to the conspiracy, count one of the indictment alleged a number of overt acts, including the formation

---

[5]The Morans do not claim that the ten-year statute of limitations for bank fraud under 18 U.S.C. § 1344 had run by the time of the indictment. See 18 U.S.C. § 3293. In this regard we point out that the indictment charges only acts the prosecution of which had not been barred by the previously applicable five-year statute of limitations as of August 1989. See Pub.L. No. 101-73 § 961(l)(3)).

of the MDG Trust. The two substantive bank fraud counts corresponded to the two bank loans, and the conspiracy count covered conduct from October 1986 to June 1988. The indictment also contained an unrelated fourth count of bank fraud against Nora Moran in connection with her alleged involvement with a loan made by First American to finance the purchase of a property located on Marlborough Street in Boston.

The trial commenced on May 17, 1999. In its case-in-chief, which lasted 24 days, the government presented evidence purporting to demonstrate that John Moran fraudulently had exploited his position as the bank's closing attorney with respect to the Puente/Boersner projects by failing to disclose his financial interest in them. In particular, the evidence showed that First American's records, including Noke's memoranda to the Executive Committee, did not reflect any disclosure by John Moran of his brokerage arrangement with Puente and Boersner or his profit interest in the properties. For example, the closing settlement statements, which notably John Moran did not sign, indicated only that he received legal fees. Further, the record did not contain any documentary evidence disclosing his status as MDG Trust beneficiary.

Significantly, Noke testified in the government's case that John Moran did not inform him of his economic interest in the Puente/Boersner projects before the loans were submitted to the Executive Committee for approval. Noke claimed that if he duly had been notified he would have prepared an insider transaction report

for the bank; no such report was introduced at trial. Ragalevsky and Adams testified that regardless of his possible disclosure to Noke, John Moran was required to notify upper level management in writing of his financial stake in the projects to satisfy his professional duty as the bank's attorney; no such written disclosure was introduced at trial. The government also elicited testimony from a number of other witnesses on the nature of the professional duties John Moran owed to First American, as well as John Moran's own testimony from another trial acknowledging the ethical and legal duties of a fiduciary.

Government witnesses described with respect to Nora Moran the duties a director owes to a bank, such as that of full and fair disclosure of any facts material to the bank's interests. The government also introduced evidence demonstrating her involvement in the Puente/Boersner loans (visiting the project sites and executing the MDG Trust document) and her failure to inform any bank official of her husband's outside interests regarding the properties. Further, the government attempted to show that Nora Moran voted to approve the loans at the January 15, 1987 Board of Directors meeting on the theory that it was routine practice for loans approved by the Executive Committee to be submitted to the Board of Directors for ratification or modification.

At the close of the government's case, the Morans made motions for judgments of acquittal under Fed. R. Crim. P. 29. The

court granted Nora Moran's motion with respect to count four,[6] but denied the motions as to the remaining counts. In the defense case, John Moran testified to having made full and timely disclosure of his outside pecuniary interest in the bank loans to Noke. John Moran also testified that in November 1986, he had engaged in a similar transaction in which he functioned as the closing attorney for First American and nevertheless received a $100,000 finder's fee from the borrower. He claimed that he had disclosed this earlier conflict of interest to William Collins, the bank's loan officer on the November 1986 loan.

On cross-examination, John Moran indicated that he had sent a check for $18,750 to his wife via her real estate company on January 15, 1987, the very day of the Board of Directors meeting at issue in this case. John Moran did not indicate on the check what the payment represented, though it was his common practice to do so. The government sought to demonstrate that the Morans routinely commingled their business finances during the relevant time period. Nora Moran presented only one witness in her defense, an economics expert who discussed the general banking and real estate climate during the relevant time period. The government called William Collins as its rebuttal witness. He testified that he had no recollection of the November 1986 loan about which John Moran testified or of any disclosure John Moran made as to his finder's fee.

---

[6]The judgment of acquittal on count four is not before us on appeal.

At the close of all the evidence, the Morans again moved for judgments of acquittal. The court reserved its ruling and charged the jury which, on July 14, 1999, returned guilty verdicts on the three remaining counts against the Morans. Thereafter, the Morans filed post-trial motions under Fed. R. Crim. P. 29(c) seeking judgments of acquittal. The district court received memoranda and draft transcripts from all parties and on July 13, 2000, on the basis of the submissions issued the decision and order from which the government appeals, entering a judgment of acquittal on all counts for want of evidentiary support. The court made its ruling considering only the evidence introduced on the government's direct case rather than on the full trial record, citing to Fed. R. Crim. P. 29(b), which mandates that a court revisiting a reserved motion for judgment of acquittal may consider only evidence introduced as of the time that the court reserved ruling on the motion.

The court concluded that Noke's testimony and the absence of bank records documenting John Moran's timely disclosure of his brokerage and profit arrangement could not sustain John Moran's convictions on the substantive bank fraud counts as the defense successfully had demonstrated defects in Noke's memory and work performance and in First American's record-keeping practices. The court further concluded that the government failed to show that Nora Moran participated in any vote on or otherwise facilitated the approval of the Puente/Boersner loans and that the evidence therefore was insufficient to sustain the verdicts convicting her

-12-

of substantive bank fraud.  The court did not consider an aiding and abetting theory of liability.  Finally, the court concluded that the government's failure to prove the underlying substantive offenses was fatal to the conspiracy convictions of both Morans. The government timely filed a notice of appeal on August 10, 2000. We have jurisdiction over an appeal from a final judgment of the district court pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731,[7] and the district court exercised subject matter jurisdiction pursuant to 18 U.S.C. § 3231.

## II.  DISCUSSION

### A.  Standard and Scope of Review

We review Rule 29 determinations de novo.  United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997).  At both the trial and appellate level, a court must determine "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a

---

[7] 18 U.S.C. § 3731 provides for appellate jurisdiction over an appeal brought by the government in a criminal case from an order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment.  Though the statute in terms does not refer to appeals from orders entering a judgment of acquittal, the Supreme Court has interpreted section 3731 as allowing government appeals in criminal cases "whenever the Constitution would permit."  United States v. Wilson, 420 U.S. 332, 337, 95 S.Ct. 1013, 1019 (1975).  Here, double jeopardy principles do not bar appeal by the government because the district court granted the Rule 29 motions after the jury rendered a guilty verdict and the district court will be able to implement our conclusion that the judgment of acquittal was improper simply by entering a judgment on the verdict on remand rather than by requiring the Morans to submit to trial for a second time.  See United States v. Scott, 437 U.S. 82, 91 n.7, 98 S.Ct. 2187, 2194 n.7 (1978).

rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). Under this formulation, a court considers all the evidence, direct and circumstantial, and resolves all evidentiary conflicts in favor of the verdict. Carroll, 105 F.3d at 742. Thus, we do not weigh the credibility of the witnesses or "assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir. 2001) (internal quotation indication omitted). Accordingly, as long as the guilty verdict finds support in a "plausible rendition of the record," it must stand. United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

We deal initially with the procedural issue attributable to the district court's anchoring its analysis in the record as it existed at the end of the government's case-in-chief. In this regard we hold that our review should encompass the record of the entire trial rather than being confined only to the direct evidence presented by the government. Fed. R. Crim. P. 29(b) permits a court to reserve deciding a motion for judgment of acquittal until after a jury renders its verdict; if the court chooses to do so, when revisiting the motion it may consider only the record as it stood at the time it reserved its ruling.[8]

_____

[8]Rule 29 (a) and (b) read in full:

(a) MOTION BEFORE SUBMISSION TO JURY. Motions for directed verdict are abolished and motions for judgment

The district court, however, denied rather than reserved its ruling on the Morans' initial Rule 29 motions with respect to counts one through three at the close of the government's case. The Morans then introduced evidence, and the government introduced additional evidence in rebuttal. At the close of trial, the Morans again made Rule 29 motions on which the court did reserve its ruling, allowing it to act substantively on the motions after the jury returned its verdict. At that point the court could not act on the original motions for acquittal adjudicated after the government's case-in-chief and thus was required to consider the full record when acting on the Morans' second motions for acquittal.

We are satisfied that simply by labeling its post-trial Rule 29 ruling as a reconsideration and reversal of its earlier

---

of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.

(b) RESERVATION OF DECISION ON MOTION. The court may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

-15-

Rule 29 ruling, the court could not relate back the time when it reserved its ruling on the motions made at the end of all the evidence to the point at which it denied the first motions for acquittal. After all, if it could do so it effectively would circumvent the explicit requirement in Rule 29(b) that if a court "reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Moreover, if the court could deny a motion for acquittal at the end of the government's case-in-chief and then grant it on reconsideration, as a practical matter there would be no distinction between denying a motion for acquittal or reserving a ruling on it for either way the court subsequently could grant the motion on a static record.

   B.   Bank Fraud Charges Against John Moran (Counts Two and Three)

To prove bank fraud under 18 U.S.C. § 1344, the government must show that the defendants: (1) engaged in a scheme or artifice to defraud or obtain money by means of materially false statements or misrepresentations; (2) from a federally insured financial institution; and, (3) did so knowingly. United States v. Kenrick, 221 F.3d 19, 30 (1st Cir.) (en banc), cert. denied, 531 U.S. 1042, 121 S.Ct. 639 (2000).[9] We have defined "intent to

---

[9]The bank fraud statute, 18 U.S.C. § 1344, provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice--

   (1) to defraud a financial institution; or

-16-

defraud" as "an intent to deceive the bank in order to obtain from it money or other property." Id. In general, ascertaining whether a scheme is fraudulent "is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." United States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994) (quoting United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)). We look to the entire circumstances of the defendants' conduct and any inferences drawn therefrom as an indication of their intent. See Id. at 425. Furthermore, the bank need not be the immediate victim of the fraudulent scheme and need not have suffered actual loss so long as the requisite intent is established and the bank was exposed to a risk of loss. See United States v. Barrett, 178 F.3d 643, 648 (2d Cir. 1999); see also United States v. Blasini-Lluberas, 169 F.3d 57, 65 (1st Cir. 1999) ("The government need not prove actual loss as a result of the scheme . . . ."). We also note that each distinct execution of a scheme to defraud constitutes a separate indictable offense, for instance where, as here, the government charges that multiple and separate loans were obtained to finance

---

          (2) to obtain any of the money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

-17-

multiple and separate real estate transactions. <u>Brandon</u>, 17 F.3d at 422.

Considering the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict, we conclude that a jury well could have found beyond a reasonable doubt that John Moran knowingly executed a scheme to defraud First American. As its closing attorney on the Puente/Boersner loans, he had a duty to represent its interests which, at the absolute nadir of potential discharge, required him to inform the bank that as the mortgage broker he stood to reap 1.5% of any successfully borrowed amounts. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>De La Mata</u>, 266 F.3d 1275, 1293 (11th Cir. 2001) (bank officials owe a fiduciary duty to the bank and its depositors, which obligates the avoidance of fraud, bad faith, usurpation of corporate opportunities, and self-dealing); <u>United States</u> v. <u>Silvano</u>, 812 F.2d 754, 759 (1st Cir. 1987). Likewise, he was required to disclose his divergent profit stake in the real-estate projects that the loans financed.[10] There was ample evidence for

---

[10]We emphasize that section 1344 by its literal terms proscribes the knowing execution or attempted execution of a scheme to defraud a financial institution. Accordingly, bank fraud can be proven even if the defendant does not owe a pre-existing disclosure duty to the bank. Thus, evidence of an affirmative misrepresentation, half-truth, or omission of material information made knowingly to a bank to beguile an economic boon from it in itself will suffice to support a conviction. As explained in <u>United States</u> v. <u>Colton</u>, 231 F.3d 890, 898-903 (4th Cir. 2000), federal bank fraud, consistent with its statutory purpose, extends to active concealment even in the absence of a fiduciary, statutory, or other independent legal duty of disclosure where the defendant acts with the requisite intent to mislead or deceive. While the existence of the defendant's independent duty to the

-18-

the jury to conclude that John Moran was aware of his professional responsibilities but did not meet them.

Noke, the loan officer who represented the bank in the transactions, testified that he did not recall John Moran making any disclosures concerning his two-fold financial arrangement with Puente and Boersner. His lack of recollection is notable for two reasons: (1) circumstances where the bank's closing attorney also functioned as a mortgage broker for and co-partner with the bank's clients in the same transaction were rare, and the jury reasonably could have balanced this unusual circumstance against the fact that nothing about the Puente/Boersner loans stood out in Noke's mind; (2) insider arrangements of this nature typically triggered greater scrutiny and generated special paperwork. Accordingly, the absence of bank records documenting John Moran's outside arrangements was another factor that the jury could take into account in concluding that he had concealed the details of his relationship with Puente and Boersner.[11] Moreover, in contrast the government introduced

institution is a factor to be considered in evaluating the prosecution's case, for instance with respect to the defendant's state of mind (a bank director or a bank attorney would be harder pressed to claim good faith than an unseasoned layperson), ultimately proof of a knowing "scheme or artifice to defraud" -- whether executed by affirmative acts or omissions -- is all that the statute requires for conviction.

[11]It is also significant that, although he testified, John Moran did not introduce at trial any records documenting his alleged disclosure. Notwithstanding the passage of time, the relocation of offices, or the intervention of allegedly calamitous natural events, one might reasonably expect that John Moran would have been careful to retain copies of any documents disclosing to bank officials his outside dealings with Puente and Boersner considering the intense scrutiny to which the loans were subjected

insider loan records from June 1986 showing that Elizabeth Finnegan, a trustee of First American, disclosed her financial interest as a principal in American Healthways, Inc. d/b/a Nightingale before a vote was taken to consider increasing the company's line of credit.

The Morans, particularly John Moran, mounted three principal lines of attack against the government's non-disclosure theory: (1) many of the bank's records from the relevant time period were in disarray or missing; (2) Noke's testimony was undermined to the extent that he could not recall significant details about the transactions or participants in question and by the fact that nearly 10 years had passed from the time that the loans were closed; (3) John Moran testified that he had made the appropriate disclosures. The last fact is critical. Though a criminal defendant by right may opt to testify, see 18 U.S.C. § 3481; Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2709 (1987), he does so at his or her own peril. See, e.g., United States v. Dunnigan, 507 U.S. 87, 93-98, 113 S.Ct. 1111, 1116-19 (1993).

The government discredited John Moran's testimony that he had disclosed his $100,000 finder's fee from the November 1986 loan for which he also represented First American at closing by calling

within approximately one year from their approval. Certainly the fact that Nora Moran was asked to resign her director position in the spring of 1988 pursuant to the independent findings of outside counsel strongly would have forewarned John Moran of the utility of preserving with painstaking care any exculpatory documents in his possession.

in rebuttal the loan officer involved who, like Noke, did not recall John Moran making any disclosure of a conflict of interest. That testimony, coupled with the unique vantage of the jury to assess John Moran's demeanor and make key credibility determinations concerning his veracity and attention to detail as measured against the lack of independent corroboration for his testimony, permitted the jury, on balance, to disbelieve John Moran on the one hand and credit Noke on the other irrespective of any gaps or arguable inconsistencies in Noke's testimony. See, e.g., United States v. Romero, 32 F.3d 641, 646 (1st Cir. 1994) (appellate court does not secondguess the jury's decision to credit testimony which contains an inconsistency because it "would usurp the jury's role to reject its decision to believe or disbelieve a witness because of such inconsistencies").[12]

Inasmuch as a jury could conclude that John Moran failed to disclose his broker relationship with Puente and Boersner and his interest in their projects, the record supports a conclusion that John Moran refrained from making the disclosures knowingly, affirmatively, and with a clear motive to secure a financial windfall at the bank's potential expense. As an attorney for First American, John Moran was positioned uniquely to expedite the process by which Puente and Boersner could obtain financing for their development projects, for instance by bypassing conventional bureaucratic impediments to arrange critical meetings with bank

---

[12]We reiterate that the district court failed to consider John Moran's testimony or the government's rebuttal case in its analysis when granting the motions for acquittal.

loan officials and inspections of the properties.  At the same time, as an experienced real estate attorney, John Moran was well aware that disclosure of his dual, conflicting broker-client relationship with the loan principals and of his direct interest in the profits generated by their development projects could jeopardize his stake in the venture.[13]  In fact, the considerable extent to which John Moran stood to benefit from the loans -- $250,000 in broker fees and 20% of profits -- is further probative of his motive to conceal facts that were potentially outcome-determinative with respect to approval of the loans.

Support for a conclusion that John Moran deliberately and deceptively concealed material information is supplied also by the active steps he took to eliminate a paper trail connecting himself to the loans and thereby avert inquiry from bank officials. Specifically, John Moran recruited his wife to function as the only declarant-trustee on the MDG Trust which, being a Massachusetts Business Trust, does not disclose as a matter of public record the identity of its beneficiaries.  Thus, John Moran was not linked clearly to the entity.  When Puente and Boersner created the Boston Commonwealth Trust and the 76-82 Rutland Square Trust to collect

---

[13]That is to say, the information was material because had it been known that John Moran's legal representation was presumptively partial and hence suspect, the bank might have taken steps to protect itself from the very real likelihood of legal action or regulatory liability, for instance by delaying the approval of the loans until a further independent investigation of the loans could be conducted.  See Neder v. United States, 527 U.S. 1, 16, 119 S.Ct. 1827, 1837 (1999) (an omission is material if it is "capable of influencing the decision of the decisionmaking body") (citations and internal punctuation omitted).

the loan proceeds and take title to their properties, at John Moran's behest they designated MDG as a 20% beneficiary. However, there were no signatures of anyone purporting to represent MDG on the documents setting up the two trusts. Consequently, when a letter from an attorney for Puente and Boersner disclosed to First American that MDG was one of three beneficiaries of the trust that was taking title to the Commonwealth Avenue property, John Moran was insulated because the bank did not have information linking him to MDG. To further maintain his anonymity with respect to MDG, John Moran did not submit the customary post-closing settlement statements or any records regarding the trustees or beneficiaries of the MDG Trust. See, e.g., United States v. Cauble, 706 F.2d 1322, 1355 (5th Cir. 1983) (considering defendant's "disregard for the bank's routine practices" relevant to intent to defraud).

In sum, there was sufficient evidence to allow a rational jury to conclude, beyond a reasonable doubt, that John Moran concealed his financial arrangements with Puente and Boersner not as the product of a good faith, honest oversight but rather pursuant to an affirmative endeavor calculated to defraud First American. As the evidence supports the conclusion that John Moran's conduct rose to the level of a knowing "scheme or artifice" to defraud, the bank fraud convictions returned against him must be reinstated.

### C. Bank Fraud Charges Against Nora Moran (Counts Two and Three)

We recognize that the government's bank fraud case against Nora Moran was not as strong as that against John Moran.

-23-

In this regard it is not clear that at the January 15, 1987 meeting of First American's Board of Directors, Nora Moran participated in a dispositive vote on the loans. Though the government advanced a theory that a vote was taken to ratify the Puente/Boersner loans, it appears that the Board rubber-stamped as a mere formality a summary report of loans the Executive Committee had approved in December. Moreover, it is not clear that the Board of Directors at that time had the power to reject the Executive Committee's loan decisions.

Nevertheless, the district court erred for two independent reasons when it granted Nora Moran a judgment of acquittal on counts two and three. To begin with, without regard for what transpired on January 15, 1987,[14] a rational trier of fact could have found that Nora Moran, who admitted to Ragalevsky and Adams that she was aware of her husband's outside dealings and arrangements concerning the projects prior to the consummation of the transactions at issue, chose not to disclose the conflicts to the appropriate bank officials in her capacity as bank director because she anticipated that a financial windfall would accrue to her husband (and by extension to her) should the loans be approved and feared that a disclosure would undermine the approval process.

---

[14]We note that the government's theory of Nora Moran's liability for bank fraud was not limited exclusively to her active participation in the January vote. For instance, the indictment charged that in spite of her fiduciary position and independently of any Board votes or meetings she chose not to disclose her husband's brokerage or profit arrangement and in fact executed the MDG Trust document in order to facilitate the fraudulent scheme. Furthermore, the government pursued its non-disclosure theory of liability at trial and during its closing argument.

Moreover, there was significant evidence tending to establish Nora Moran's knowing, active participation in the fraudulent scheme: Nora Moran accompanied her husband, Puente, Boersner, Noke, and a construction inspector to visit the project sites in November 1986 before the loan applications were submitted as proposals or approved; a mere two days before the Executive Committee approved the loans, she signed the papers establishing the MDG Trust which functioned as a repository for the 20% interest in the profits generated by the Puente/Boersner development projects; John Moran's secretary, Elizabeth Longo, ordinarily served as a trustee for his real estate transactions, suggesting that such a break from routine likely would have sparked a modicum of inquiry from Nora Moran as to the purpose for the formation of MDG; John and Nora Moran shared financial matters, including filing joint tax returns and transferring funds between their separate business ventures; and, Nora Moran was an astute real estate broker and bank director familiar with the affirmative duties of disclosure governing fiduciaries when confronted with bank transactions that affected them personally.[15]

Considered together, the foregoing facts justified a conclusion that Nora Moran knew of her husband's stake in the

---

[15]For example, there was evidence to suggest that it was the bank's practice to provide every director with a copy of the Code of Professional Ethics. Furthermore, Nora Moran attended a July 9, 1986 meeting of the Board of Directors at which Finnegan disclosed her insider stake in the proposed Nightingale loan and abstained from voting.

outcome of the loans[16] and understood that federal banking regulations, First American's Code of Professional Ethics, and her common-law fiduciary status as a bank director required her to make the appropriate disclosures.[17] Nevertheless she chose not to divulge the information to maintain the false impression that the loans were not tainted or suspect in any significant way.

We recognize, as emphasized by the district court, that Nora Moran's conduct may not have directly induced First American to allocate the $17 million in loans to Puente and Boersner or otherwise have influenced anyone involved in the lending decision-making process.[18] However, a finding that her conduct had such an impact was not required for a conviction of bank fraud in this case. See, e.g., Kenrick, 221 F.3d at 29 (actual reliance by the bank "plainly ha[s] no place in the federal fraud statutes") (quoting Neder v. United States, 527 U.S. 1, 25, 119 S.Ct. 1827, 1841 (1999)). Nor, as Nora Moran suggests is the case, could the evidence establish only that she breached nothing more than a

---

[16]We emphasize further that the jurors, drawing upon common sense and their own life experiences, reasonably might have inferred that spouses such as the Morans in relationships whose probity and openness have not been called into question (for instance before the closings on the loans) are wont to share non-confidential details of their professional lives.

[17]We note that the district court in its opinion indicated that Nora Moran at least by December 11, 1986, was aware of John Moran's brokerage fee and 20% interest and, in failing to disclose this information, "violated that part of Regulation O and the Bank's Code of Ethics requiring such disclosure." Opinion at 23.

[18]See Opinion at 59-60 ("the government failed to present evidence sufficient for a reasonable jury to find that Nora Moran knowingly participated in actions of the Bank that had the effect of causing or facilitating the making of the loans").

fiduciary duty owed to First American which conduct, standing alone, purportedly cannot constitute bank fraud as a matter of law.[19]  Rather, the evidence supported a conclusion that Nora Moran knowingly executed the scheme to defraud First American through her deceptive acts (for example, signing the trust documents for the entity holding the 20% profit interest) and omissions (deliberately concealing information that might have delayed or terminated the loan review process) and therefore was a sufficient basis on which the jury could convict her for bank fraud.

Alternatively, these facts make out the essential elements of aiding and abetting liability for bank fraud.[20]  Thus, even if Nora Moran did not execute or attempt to execute the scheme, there was sufficient evidence to conclude beyond a reasonable doubt that she willfully aided and abetted John Moran's fraud by associating herself with his venture and seeking by her actions to make it succeed.  See 18 U.S.C. § 2; see also United States v. Colon-Munoz, 192 F.3d 210, 223 (1st Cir. 1999).

---

[19]The Court of Appeals for the Fifth Circuit in United States v. Henderson, 19 F.3d 917, 923 & n.7 (5th Cir. 1994), confronted a similar claim that mere breach of fiduciary duty cannot constitute a "scheme or artifice" to defraud under 18 U.S.C. § 1344 but, as we do here, found sufficient evidence of more than such a breach, thus obviating the need to reach the issue. Nevertheless, while "not every breach of every fiduciary duty works a criminal fraud," United States v. George, 477 F.2d 508, 512 (7th Cir. 1973), we find no federal jurisprudence establishing as a matter of law that a failure to disclose a conflict of interest or a breach of fiduciary duty cannot constitute or aid and abet a scheme to defraud, assuming the requisite materiality and specific intent to deceive for personal gain are established.

[20]We note that an alternative accomplice theory of liability was charged in the indictment, advanced by the government at trial, and presented to the jury in the court's final instructions.

Furthermore, the evidence was sufficient on which to premise Nora Moran's culpable state of mind for aiding and abetting liability to the extent that she consciously shared her husband's knowledge of the underlying criminal scheme and intended to participate in it for the purpose of bringing about financial gain.

### D. Conspiracy Charges Against John and Nora Moran (Count One)

Finally, we find that the government offered sufficient evidence to convict both Morans of the conspiracy to commit bank fraud under 18 U.S.C. § 371. As we elaborated previously, the evidence supported a conclusion that the Morans agreed to participate in a scheme to defraud First American for the common goal of personal pecuniary gain,[21] knowingly and voluntarily participated in the conspiracy, and took at least one affirmative overt act in furtherance of the conspiracy. See Blasini-Lluberas, 169 F.3d at 67. Accordingly, the jury verdict on the conspiracy count must be reinstated.[22]

---

[21]Of course, the agreement need not be made expressly nor proved by direct evidence. See, e.g., United States v. Woodward, 149 F.3d 46, 67, 68 (1st Cir. 1998).

[22]The district court disposed of the bank fraud conspiracy convictions on the ground that the evidence could not support a conviction against either Moran on the underlying bank fraud substantive offenses. See Opinion at 60 ("the failure to establish beyond a reasonable doubt that either defendant committed the substantive offense was also a failure to establish beyond a reasonable doubt the agreement between them to commit the offense") (emphasis in original). It did not consider, however, that a defendant can be guilty of the inchoate offense of conspiracy even if he and his co-conspirator are not guilty of the underlying substantive offense so long as he knowingly entered an agreement to commit the substantive offense and participated in the plot to effectuate the offense; success is not a required element. See,

## III.  CONCLUSION

For the foregoing reasons, we reverse the judgments of acquittal, reinstate the convictions on counts one, two, and three, and remand the case to the district court for further proceedings.

**Reversed and remanded**.

(Concurring Opinion follows.)

BOUDIN, <u>Chief Judge</u> (concurring).  John Moran and Nora Moran were charged with bank fraud under 18 U.S.C. §§ 1344, 371 (2000).  The jury found both defendants guilty, but the district court granted a motion for acquittal as to both defendants.  The government has appealed.  My concern is with the evidence against Nora Moran.

The government's primary theory in the trial was that Nora Moran, as a director of the bank, had voted to approve certain loans without disclosing her husband's interest in them.  In the alternative, the government argued that Nora Moran had an independent duty to disclose her husband's participation on both

---

e.g., <u>Salinas</u> v. <u>United States</u>, 522 U.S. 52, 65, 118 S.Ct. 469, 477 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable itself."); <u>United States</u> v. <u>Belardo-Quinones</u>, 71 F.3d 941, 944 (1st Cir. 1995) (conspiracy may exist even if the object of the conspiracy cannot be achieved).

sides of the bank loan and that, because she fostered John's fraud (as described below), she was guilty of aiding and abetting. The district court's opinion directing an acquittal discussed the voting theory which it found unsupported by the evidence, but it not discuss the government's alternative theories.

On appeal, the panel's reinstatement of the jury's verdict does not rely on the government's primary theory, namely, that Nora voted on the loan. As the panel opinion points out, there is no clear proof that Nora knowingly voted on the loan benefitting her husband. The only evidence is that Nora participated in a board of directors' vote that rubber-stamped the approval of a summary report of the loans made in the previous month. A summary report contained only headline numbers and did not specify the underlying loans and their details.

To sustain the jury's verdict as against the district court's judgments of acquittal, one must rely on the government's alternative arguments. Under one theory, Nora failed (as a fiduciary) to reveal her husband's double dealing and therefore committed fraud by that non-disclosure; under the (sounder) aiding and abetting version of the theory, she also took positive steps-- such as signing the papers to establish the business trust that was used to conceal the Morans' interest in the loans--to further John's fraud. In either case, it was necessary for the bank fraud conviction to prove that Nora acted with intent to defraud. United States v. Kenrick, 221 F.3d 19, 30 (1st Cir.) (en banc), cert.

-30-

denied, 531 U.S. 961 (2000), and cert. denied, 531 U.S. 1042 (2000).

This culpable state of mind with respect to Nora depends on proving four facts: first, that Nora knew of John's participation on both sides of the transaction; second, that she knew that John had not disclosed his conflict of interest to the bank; third, that she knew that she had an obligation to disclose John's position if John did not make the requisite disclosure; and fourth, that she acted dishonestly rather than negligently in failing to disclose. The second condition is doubtful and, if the second fails, the fourth (which depends on the other three) also is infirm.

Nora certainly knew that John was acting for the borrowers; there is clear evidence on this point. What is less clear is whether she knew that John was acting for the bank as well; but this can probably be inferred from her statement that she had understood that John had disclosed his interest to the bank. If John was not also acting for the bank, he would hardly have needed to mention to his wife his alleged disclosure to the bank since there would have been nothing to disclose.

On the second condition--that Nora knew of John's failure to disclose--the government's evidence is extremely thin. Clearly such a factual predicate is essential: it would be quite a stretch to hold Nora criminally liable for failing to make an independent disclosure to the bank, even though she believed that John had disclosed his interest in the project. The only evidence as to

whether John told her he had disclosed his interest to the bank is Nora's claim that he said he had. The statement was made by Nora <u>prior</u> to trial and recorded by a third party. Although inadmissible hearsay if offered by Nora, the recordation was offered into evidence by the government for its own purposes.

Of course, the jury may have disbelieved her statement, made after the fact to bank attorneys investigating the Morans' involvement with the loans, as a <u>post hoc</u> attempt at exculpation. It is not clear what basis the jury would have had for such a rejection. John certainly could have made such a statement to his wife, truthfully or not; and Nora did not testify at trial so her demeanor was not subject to assessment. Still, the jury could simply not have believed Nora's statement.

We can never know whether the jury found fraudulent intent based on this theory. At trial, the government concentrated primarily on the hopeless theory that Nora had voted on the loan even though it presented its alternative theories as well. Yet in this court Nora does not argue that evidence of fraudulent intent was entirely lacking but argues that her failure to disclose was not material, an unpersuasive position given the reach of the materiality concept. It is not easy to support the district court's result on the basis of doubts not relied on by the district court in granting the motion, nor urged by the defendant herself on this appeal.

Because Nora moved for a new trial in the district court--a motion initially mooted by the directed judgment of acquittal--

that motion remains to be considered by the district court on remand.  The district court, already disposed to grant an acquittal outright, may well be inclined to grant a new trial on weight-of-the-evidence grounds.  <u>United States</u> v. <u>Montilla-Rivera</u>, 115 F.3d 1060, 1067 (1st Cir. 1997).  Given the collapse of the government's primary voting theory and the thin factual support for the fraudulent non-disclosure claim against Nora, a new trial for Nora might be amply justified, assuming that the government's asserted objection to the timeliness of the new trial motion can be overcome.