

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-23-2003

# USA v. Khorozian

Precedential or Non-Precedential: Precedential

Docket No. 02-2820

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Khorozian" (2003). *2003 Decisions.* Paper 401.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/401

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 20, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2820

UNITED STATES OF AMERICA

v.

ANGELA KHOROZIAN,

Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 00-cr-00393-1)
District Judge: Honorable William H. Walls

Argued April 24, 2003

Before: SCIRICA,* *Chief Judge*, AMBRO and
GARTH, *Circuit Judges*

(Opinion filed June 20, 2003)

> Herald Price Fahringer, Esquire
>  (Argued)
> Erica T. Dubno, Esquire
> Lipsitz, Green, Fahringer, Roll,
>  Salisbury & Cambria, LLP
> 780 Third Avenue, 32nd Floor
> New York, NY 10017

---

* Judge Scirica began his term as Chief Judge on May 4, 2003.

Ivan Stephan Fisher, Esquire
251 East 61st Street
New York, NY 10021

*Attorneys for Appellant*

Christopher J. Christie
 United States Attorney
George S. Leone
 Chief, Appeals Division
Gail Zweig (Argued)
 Assistant U.S. Attorney
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102-2535

*Attorneys for Appellee*

---

**OPINION OF THE COURT**

---

AMBRO, *Circuit Judge*:

We address the scope of the federal bank fraud statute, 18 U.S.C. § 1344. Angela Khorozian appeals her conviction on the ground that she could not have conspired to commit, and could not have committed, bank fraud by negotiating counterfeit checks because she did not know that those checks were counterfeit. She also alleges various errors in the District Court's evidentiary rulings, jury instructions, and application of the Sentencing Guidelines. We affirm both the conviction and sentence.

## I. Background

In 2000, Khorozian was approached with a moneymaking opportunity by her longtime acquaintance Eduardo Queirolo, a businessman from Brazil. Queirolo told Khorozian that a third person, Mr. Camilo, had presented Queirolo with a scheme in which he could obtain part of a sizable commission — $6 million — if he negotiated $20,398,872 in checks through a bank in the United States. Camilo said the checks needed to be negotiated in the United States to avoid high taxes that would result were

they negotiated in Brazil. Queirolo requested Khrozian's assistance in this project. It was agreed that Khorozian would receive $3 million of the commission, Queirolo and Camilio would each receive $1 million, and other unnamed individuals would split the remaining $1 million.

To facilitate negotiation of the checks, Khorozian attempted to open a commercial bank account at Hudson United Bank ("Hudson United").[1] To find out how to open such an account, she spoke with John Demetrius, a personal friend who sits on Hudson United's board of directors. Demetrius, in turn, referred Khorozian to David Yanagisawa, a Senior Vice President at Hudson United.

Yanagisawa established an account for Khorozian at a meeting in which she made three misrepresentations. First, Khorozian told Yanagisawa that she expected to make the initial deposit via wire transfer. Her statement is significant because a wire transfer is an instantaneous transfer of funds and thus would pose no financial risk to Hudson United. Yanagisawa testified that, had he known the initial deposit would be $20 million in checks, he would not have opened the account because of the increased risk. Second, Khorozian represented that she would be using the deposited funds for investment in a sugar plantation in Africa when in fact she had no such plans. Third, she opened the account in the name of "Sugarbank," a New Jersey corporation whose authorization to do business had lapsed due to its failure to pay taxes.

On May 25, 2000, Queirolo received two checks. One was allegedly drawn on the account of Costco Wholesale Corp. and the other on Liberty Carton Co.'s account. The checks were both payable to an individual named Luiz Carlos Teixiera. At trial, Queirolo testified that he verified that the checks were not the result of drug or arms trafficking, that Costco and Liberty Carton had sufficient funds to pay the checks, and that the check numbers were "correct." He was unable to verify whether the signatures on the checks were genuine. Thus, because his investigative resources in Brazil

---

1. Khorozian and the Government agree that it would have been impossible to negotiate $20 million in checks through a personal account.

were limited, he asked Khorozian to perform a more thorough investigation in the United States. She agreed and later told him that she investigated the checks and that they were good. On May 30, 2000, Queirolo arrived in the United States with the checks. Khorozian endorsed both checks as payable to Sugarbank.

The next day, Khorozian and Queirolo went to Hudson United to deposit the checks. They were assisted by the Custom Branch Manager, Anthony Moscati. At this meeting, Khorozian introduced Queirolo as "Mr. Teixeira," the individual to whom the checks were payable — a fourth misrepresentation. Moscati showed the checks to Tom Shara, the Executive Vice President in charge of commercial loans, who accepted the checks, but subjected them to a thirty-day hold for verification, given the large sum at stake.

Upon returning home, Khorozian received a fax — sloppily handwritten — instructing her and Queirolo how to distribute the $20 million. Khorozian and Queirolo had expected that they would be asked to forward the funds to a single bank account, but the fax instead instructed them to wire money to "about five" accounts, some held by individuals with Arabic names. The fax's unexpected instructions and unprofessional appearance made Khorozian and Queirolo suspicious, according to Queirolo, but they nonetheless proceeded with their plan. In fact, Queirolo testified that, as a result of the suspicious instructions and because of concerns that Hudson United might become suspicious when asked to effect the transfers, Khorozian drew up a two-page fake "investment contract" between Sugarbank and Teixiera. The agreement purported to contain the terms of a hotel development project in Africa valued at the exact amount of the two checks. The contract specified that Sugarbank would receive a 15% commission for its work — less than the agreed-upon $6 million commission, according to Queirolo, to make it appear more credible.

Queirolo testified that he and Khorozian planned to furnish the agreement to Hudson United in the event that anyone at the bank inquired into their intentions with respect to the $20 million deposit. Khorozian contends,

however, that the investment contract was genuine — that there actually was a deal between Sugarbank and Teixiera. To prove the legitimacy of the agreement and to refute Queirolo's claim that the investment agreement was drafted in response to the suspicious instructions, Khorozian sought to demonstrate at trial that she faxed a copy of the contract to Etembe Kono of the Foundation Elena, a charitable foundation in Cameroon, on May 15 — before Queirolo received the two checks drawn to Teixiera. She also sought to introduce into evidence a faxed copy of the investment contract to show that the fax header[2] was dated May 15. (The District Court refused to admit this fax, however, ruling that it was hearsay.) Khorozian did not present the investment contract to Hudson United, however.

Meanwhile, Hudson United attempted to verify the validity of the two checks by calling Costco and Liberty Carton. Each confirmed that it did not issue its respective check. Upon discovering that they were counterfeit, the bank called the FBI, which arrested Khorozian and Queirolo. Queirolo pled guilty to conspiracy to commit bank fraud and appeared as a Government witness at Khorozian's trial, at which the jury found Khorozian guilty of both bank fraud and conspiracy to commit bank fraud.

At sentencing, the Court believed that the intended Guideline range overstated the severity of Khorozian's offense. It therefore departed downward from the 51 to 63 month sentence recommended by the United States Sentencing Guidelines ("U.S.S.G.") and imposed a sentence of 18 months in prison on each count to run concurrently.

Khorozian appeals on four grounds: (1) the District Court should have granted her motion for acquittal because she did not know the checks were counterfeit and therefore lacked intent to defraud the bank; (2) the Court's jury instructions were deficient; (3) the Court deprived her of due process by refusing to admit a fax copy of the investment contract on hearsay grounds and by refusing to

---

2. A header is a line on the top of the faxed page generated by the fax machine and containing, among other information, the date on which the fax was sent.

grant a continuance so that a defense witness could travel to testify; and (4) it erred in basing Khorozian's sentence on $20 million of intended loss under the Sentencing Guidelines because she did not know the checks were counterfeit and therefore had no intent to cause the bank any loss.[3]

## II. Discussion

### A. Motion for Acquittal

The federal bank fraud statute, 18 U.S.C. § 1344, makes it a crime "knowingly [to] execute[ ], or attempt[ ] to execute, a scheme or artifice — (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." We recently interpreted § 1344 in *United States v. Thomas*, 315 F.3d 190 (3d Cir. 2002), holding that both parts of § 1344 must be read conjunctively: "there can be no such thing as an independent violation under subsection (2)." *Id.* at 197. Rather, "the *sine qua non* of a bank fraud violation . . . is the intent to defraud the bank." *Id.* at 197; *see also United States v. Blackmon*, 839 F.2d 900, 905-06 (2d Cir. 1988) (holding that a conviction under the bank fraud statute requires intent to "victimize a bank"). Were we to read § 1344 disjunctively, "almost any scheme in which a victim withdraws money from a bank and turns it over to the perpetrator would become fair game under the statute. Such a reading . . . is irreconcilable with Congressional intent." *Thomas*, 315 F.3d at 196.

Khorozian contends that there is insufficient evidence that she knew the checks were counterfeit and therefore she lacked the requisite intent to defraud Hudson United. The Government counters that there is sufficient record evidence for a jury to find that Khorozian knew the checks were counterfeit — or at least sufficient evidence to support the contention that Khorozian was willfully blind to the fact

---

3. The District Court had jurisdiction under 18 U.S.C. § 3231. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

that the checks were counterfeit. In the alternative, the Government argues that a conviction under the bank fraud statute does not require that Khorozian knew the checks were invalid, only that she made material representations to the bank that put it at risk of loss. As Khorozian's argument concerns the scope of the bank fraud statute, a question of law, our review on this issue is plenary. *Id.* at 195.

We begin by noting that "a claim of insufficiency of the evidence places a very heavy burden on an appellant," *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (quoting *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990)), and that we must interpret all facts in the light most favorable to the Government, *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001). The jury could have found that Khorozian was willfully blind to the fact that the checks were counterfeit. Queirolo instructed Khorozian to verify that the checks were genuine, but she apparently failed to do so. Had she followed Queirolo's instruction — by telephoning the drawers, for example — she would have discovered that the checks were not drawn by Costco and Liberty Carton. We point out Queirolo's instruction not because Khorozian had any legal duty to follow it, but rather because it shows his concerns — expressed to Khorozian — about the scheme's legality. Aware of Queirolo's concerns, and in light of the fact that she was attempting to negotiate over $20 million in third-party checks payable to an individual she had, according to Queirolo, never met (Teixiera), a jury could have concluded that Khorozian turned a blind eye to the checks' potential invalidity.

Moreover, Khorozian surely became suspicious after receiving the faxed instructions in sloppy handwriting.[4] As discussed, Queirolo testified that the unprofessional-looking fax and the unexpected instructions to disburse funds to multiple accounts with Arabic names (rather than a single account) made him question the transaction's

---

4. While, by this time, Khorozian had already attempted to deposit the checks, she could have called Hudson United to alert the bank that the checks might not be genuine.

legitimacy. Indeed, that fax made Khorozian so concerned about the transaction that she drafted a fake investment contract to deal with this concern. In this context, the jury could have inferred that Khorozian remained willfully blind to the checks' validity in order to receive her $3 million share of the commission. As we discuss below in connection with the jury instructions, willful blindness constitutes sufficient fraudulent intent under § 1344.

Even if Khorozian were not deliberately indifferent to whether the checks were counterfeit, the bank fraud statute nonetheless proscribes her actions. As discussed, Khorozian made four misrepresentations to Hudson United: she would make the initial deposit by wire transfer; the $20 million deposit would be invested in a sugar plantation in Africa; the company for which Khorozian opened the account, Sugarbank, was a corporation in good standing (when in fact it was not); and Khorozian introduced Queirolo as Teixiera. Mr. Yanigasawa testified that, merely for the first misrepresentation, he would not have opened the account. Thus, there is undisputed record evidence that the first misrepresentation is material: but for this false statement, the bank would not have negotiated the two checks. That misrepresentation was therefore the "first step" in Khorozian's fraudulent scheme that placed the bank at a risk of a loss.[5]

The Government's position finds support in *United States v. Moran*, 312 F.3d 480 (1st Cir. 2002), in which the First Circuit reversed a district court's judgment of acquittal under analogous circumstances. In *Moran*, the two defendants — an attorney representing a bank in connection with a loan and his wife, a director at the bank — failed to disclose their financial interest in the loan. Importantly, *Moran* held the defendants guilty even though they did not specifically intend to cause the bank a loss (*i.e.*, they intended that the loans would be repaid), but

---

5. Had Hudson United actually negotiated the checks, it would have been subjected to a $20 million loss. *See Univ. Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 701 (3d Cir. 1995) ("The general rule is a bank that pays on a forged indorsement is liable to the drawer."); *see also* U.C.C. § 3-404(d).

rather intended only to make *misrepresentations* that made a loss more likely. Specifically, because of the lawyer-defendant's relationship to the bank, he "was positioned uniquely to expedite the process by which [the investors] could obtain financing[,] . . . for instance by bypassing conventional bureaucratic impediments." *Id.* at 491. *Moran* thus illustrates that § 1344's specific intent requirement is satisfied if an individual commits an act that could put the bank at risk of loss.[6]

The cases Khorozian cites are factually distinguishable because those cases involved fraud on a third party where the bank was merely an "unwitting instrumentality" in the fraud rather than the "target of deception." *Thomas*, 315 F.3d 201 (citation omitted). *Compare id.* at 194, 201-02 (bank not at risk of loss when an individual taking care of an elderly woman fraudulently induced the patient to write checks to her; because the checks were genuine, although obtained from the drawer by fraud, the bank faced no liability); *United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998) (bank not at risk of loss when a friend of the defendant improperly made the defendant a "vendor" in her employer's database and then wrote checks to her from the company's account); *United States v. Davis*, 989 F.2d 244 (7th Cir. 1993) (scheme in which defendant submitted fraudulent tax returns to the IRS in the name of a homeless person, established a business and a commercial account with himself and the homeless person as signatories, and then deposited the tax refunds into the account, is not bank fraud because the bank was at no risk of loss); *United*

---

6. That Hudson United never actually suffered harm is also immaterial to Khorozian's defense. Section 1344 only requires that the bank be placed at risk of loss. *See United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987) ("[I]t was not necessary for the Government to prove that the intended victim of the fraud was actually defrauded."); *accord Moran*, 312 F.3d at 489. Moreover, in deciding whether an individual has committed bank fraud, we do not consider whether the bank exercised due care in attempting to prevent the loss (as here, by placing a thirty-day hold on the checks in question) or relied on the misrepresentations. *Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the federal fraud statutes.").

*States v. Orr*, 932 F.2d 330, 332 (4th Cir. 1991) (opening a bank account in a false name and subsequently drawing the account down to a negative balance is not bank fraud because "[w]hether the account was in [a false name] was not of significance to the giving of checks payable to certain payees and the return of such checks for reasons of insufficient funds.").

We therefore hold that 18 U.S.C. § 1344 proscribes Khorozian's actions.[7]

## B. Due Process Claims

### 1. Evidentiary Issue

Khorozian sought to move into evidence a fax of the (allegedly fake) investment contract sent to Kono. Khorozian alleges that she was not attempting to introduce the fax for its validity, but rather for the fact that (1) the fax header — generated by the fax machine — bore the date May 15 and (2) that the fax contained the name Teixiera. Khorozian wanted to establish, through this fax, that the investment contract was drafted on or before May 15 to refute Queirolo's testimony that it was concocted as part of a plan to deceive the bank. She also wanted to show that she and Teixiera had a commercial relationship before May 25, the date that Queirolo received the checks with Teixiera's name on them, to support her contention that she believed the funds were to be used for the investment project described in the fax (and thus that she had no intent to cause the bank loss). Reasoning that the fax was hearsay evidence, the Court refused to admit it. Khorozian argues that this ruling denied her due process. We review for abuse of discretion. *United States v. Tyler*, 281 F.3d 84, 98 (3d Cir. 2002).

Under the Federal Rules of Evidence, any written document offered to prove the truth of the matter asserted, other than one made by the declarant while testifying, is

---

7. We do not consider other arguments Khorozian raised by way of a letter styled under Fed. R. App. Proc. 28(j). Such letters, under the Rule's express terms, may include only citations to supplemental authorities and the reasons for submitting them. Thus, supplemental arguments such as Khorozian has made are out-of-bounds.

hearsay. Fed. R. Evid. 801(c). Hearsay is inadmissible unless it falls under an exception to the evidence rule that proscribes it. Fed. R. Evid. 802. The fax at issue was hearsay. First, Khorozian's ultimate purpose for offering the fax into evidence was to establish that she intended to use the $20 million for a legitimate investment. Moreover, the fax was offered to prove that it was transmitted on May 15 from Khorozian's fax machine. Because fax headers are easily fabricated by the sender, we view the fax header as akin to a statement by Khorozian that the fax was sent on May 15. *See Total Containment, Inc. v. Environ Products, Inc.*, 921 F. Supp. 1355, 1370 n.3 (E.D. Pa. 1995), *affirmed in part and vacated in part on other grounds*, 1997 WL 16032 (Fed. Cir. 1997) ("Apparently, a fax burn-in can be rather easily faked. The time and date printed by the machine can be changed merely by resetting the machine. Alternatively, the burn-in from one document can be photocopied onto another document with an office copier.").

The fax does not fall into any explicit exception to the hearsay rule. And while Rule 807 provides that a "statement not specifically covered by [any of Rule 803 or 804's explicit exceptions], but having equivalent circumstantial guarantees of trustworthiness," may under certain circumstances be admitted, we do not believe that the fax header is sufficiently trustworthy to warrant the fax's admission. As noted above, fax headers are easily faked. In this context, the District Court had reason to believe that Khorozian fabricated the fax header. First, the Government presented evidence suggesting that Khorozian induced a notary to notarize falsely the investment contract. One who would do this is also likely to falsify a fax header. Second, while Kono was apparently ready to corroborate she received the fax on approximately May 15,[8] Queirolo testified that Khorozian intended to bribe an African official to authenticate the fax;[9] Kono may have been that person. While Khorozian could have introduced telephone records to corroborate the date of the fax to

_____

8. The Court disallowed her testimony with respect to the fax, however.

9. Queirolo testified that Khorozian was to receive $3 million in the scheme — as compared to his $1 million — because she needed the funds to bribe an African official.

Kono, she did not. *Compare Total Containment*, 921 F. Supp. at 1370 (refusing to admit a fax to prove that its contents were received on a certain date because "[n]either the sender nor the recipient of the fax [was] identified . . . [and] [n]o phone records . . . that correlate with the alleged time and date of the fax [were] introduced.").

### 2. Failure to Grant a Continuance

Khorozian sought to call Maitra Goudja Abdallah Nassara, a former judge in the Republic of Chad, to testify on her behalf. However, Nassara's wife suddenly died while he was en route. He thus returned to Chad and was unable to testify on the scheduled date. Khorozian argues that the District Court abused its discretion by denying the defense a continuance until Nassara could appear. We review this denial for abuse of discretion. *United States v. Kikumura*, 947 F.2d 72, 78 (3d Cir. 1991). Although a "myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality," denying a request for a continuance constitutes an abuse of discretion only when it is "so arbitrary as to violate due process." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

We perceive no due process violation. At trial, defense counsel essentially conceded that Nassara would not be an essential witness. Counsel represented that Nassara's "testimony would be extremely limited" and that he would be asked to refer to the investment contract that the Court already refused to admit into evidence. Indeed, counsel said "I choose to rest at this time rather than ask for a delay to permit this witness to come merely to have the crux of his testimony excluded." In this context, counsel appears to have conceded that a failure to procure Nassara's testimony would not rise to the level of a due process violation.[10]

## C. Jury Instructions

Khorozian further argues that the District Court erred in instructing the jury. We exercise plenary review in determining "whether the jury instructions stated the

10. Khorozian has not argued that the District Court's failure to grant a continuance was plain error, and we do not perceive plain error.

proper legal standard." *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995). We review the refusal to give a particular instruction or the wording of instructions for abuse of discretion. *Id.* Moreover, "when we consider jury instructions we consider the totality of the instructions and not a particular sentence or paragraph in isolation." *Id.*

### 1. Good Faith

Because good faith is a complete defense to fraud charges — negating specific intent — Khorozian requested a jury instruction that "honest mistake of judgment does not rise to the level of an intent to defraud." The District Court declined to give this instruction, instead charging that "regardless of how misleading or deceptive a plan may be[,] it is not fraudulent if it was carried out in good faith." We discern no meaningful difference between the proposed instruction and the instruction issued. Had Khorozian made an "honest mistake of judgment," it necessarily was in "good faith." The instruction's wording that, "regardless of how misleading or deceptive a plan may be" as to the bank, it is not fraudulent if "carried out in good faith" adequately informed the jury that Khorozian's intent was critical to her conviction for bank fraud.

### 2. Intent to Defraud

Khorozian also contends that the Court misinstructed the jury by charging that "the government may meet its burden to prove intent through evidence that the defendant made a material misstatement of fact with reckless disregard for the truth." She complains that "[t]his instruction emasculated the specific intent to defraud mandated by § 1344." We see no error. Although this particular statement, taken out of context, may not employ the exact language as used in *Thomas*, the jury instructions, taken as a whole, did communicate to the jury that it must find that Khorozian possessed the specific intent to defraud and put Hudson United at a risk of loss.

A "willful blindness" instruction "allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991). "We

have upheld a district court's willful blindness instruction where the charge made clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999) (internal quotation marks omitted). A willful blindness instruction also is proper when "[t]he jury could have found that [the defendant] deliberately closed his eyes to what otherwise would have been obvious to him." *Id.*; *accord United States v. Singh*, 222 F.3d 6, 11 (1st Cir. 2000) ("A willful blindness instruction is justified when the defendant claims to lack guilty knowledge, yet the evidence, taken in the light most favorable to the government, suffices to support an inference that he deliberately shut his eyes to the true facts."). As we previously concluded, the evidence supported such an inference in this case. Therefore, the District Court properly issued the willful blindness instruction.

### 3. *Scheme or Artifice to Defraud*

Khorozian objects as well to the District Court's instruction with respect to the meaning of "scheme or artifice to defraud." The Court instructed that a scheme or artifice to defraud may be found "where there has been a departure from basic honesty, fair play and candid dealings" — an instruction Khorozian argues is too vague as applied in her case. We approved such a definition in *United States v. Goldblatt*, 813 F.2d 619 (3d Cir. 1987); *accord Moran*, 312 F.3d at 489. Moreover, the jury charge viewed as a whole clearly instructed the jurors that they needed to find specific intent to defraud in order to convict. Thus we disagree yet again with Khorozian.

### D.  Sentencing Guidelines

Khorozian also contests the District Court's application of U.S.S.G. § 2F1.1, regarding amount of loss, to calculate her sentence.[11] Because the bank suffered no actual loss, the Court necessarily sentenced Khorozian based on the loss

---

11. U.S.S.G. § 2F1.1 has since been deleted and consolidated with § 2B1.1. The former § 2F1.1 can be found at Appendix C, Amendment 617 of the U.S.S.G.

she intended. *See* U.S.S.G. § 2F1.1 cmt. n.8 ("[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."). She argues that, because she did not know the checks were counterfeit, she intended no loss and thus the District Court erred in finding that $20 million was the amount of loss. *See United States v. Geevers*, 226 F.3d 186, 192 (3d Cir. 2000) ("It is clear that a district court errs when it simply equates potential loss with intended loss without deeper analysis."). We review the District Court's application of § 2F1.1 for clear error. *United States v. Evans*, 155 F.3d 245, 252 (3d Cir. 1988).

In this context, the District Court did not err. Because we hold that the bank fraud statute reaches Khorozian's conduct — and the jury found her guilty under the statute — Khorozian intended to cause the bank loss. The Government set out a *prima facie* case of intended loss by showing that the two checks Khorozian attempted to negotiate had a face value of approximately $20 million. Khorozian did not offer any evidence to disprove this amount of loss. Thus, the Government met its burden to prove the amount of loss. *See Geevers*, 226 F.3d at 194 ("[T]he government's presentation of the face value as evidence may make a prima facie case that the defendant intended to cause the full loss of those amounts . . . . Once the government presented this information to the District Court . . . the Court was free to accept the loss figure in the absence of persuasive evidence from [the defendant] that his intent was to steal a lesser amount.").

\* \* \* \* \* \* \* \* \* \*

We hold that a jury could have found Khorozian willfully blind to the counterfeit checks and that 18 U.S.C. § 1344 proscribes Khorozian's misrepresentations to Hudson United. The District Court did not deprive Khorozian of due process by refusing to admit a faxed copy of the investment contract or by refusing to grant a continuance for a witness to testify. Moreover, the Court's jury charge was proper and it correctly applied U.S.S.G. § 2F1.1 in sentencing Khorozian. We therefore affirm.

16

A True Copy:
Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*