******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* HOWARD
M. BUCKLAND
(SC 19240)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued May 19—officially released August 19, 2014*

*Sean P. Barrett*, with whom, on the brief, was *Peter G. Billings*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Charles W. Johnson*, assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Howard M. Buckland, was convicted, following a jury trial, of one count of operating a motor vehicle while under the influence of intoxicating liquor and one count of operating a motor vehicle while having an elevated blood alcohol content, in violation of General Statutes (Supp. 2014) § 14-227a (a) (1) and (2), respectively.[1] The defendant was also convicted, after a trial to the court, *Baldini, J.*, of speeding in violation of General Statutes § 14-219 (b) (3).[2] Subsequently, the defendant entered a plea of nolo contendere to the charge of having previously been convicted of operation of a motor vehicle while under the influence of intoxicating liquor in violation of § 14-227a. The trial court imposed a total effective sentence of two years of incarceration, execution suspended after eight months, a $2090 fine, and two years probation. On appeal,[3] the defendant argues that: (1) the trial court improperly denied his motion to suppress evidence regarding certain breath tests in violation of the confrontation clause as defined in *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); and (2) the constable who made the arrest lacked the requisite authority. The state contends that: (1) the state experts who testified fulfilled the requirements of *Melendez-Diaz*; and (2) the constable who made the arrest in the present case was a duly qualified special constable with the power of arrest. We agree with the state and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of December 11, 2010, Sergeant James Desso, a special constable employed by the town of Stafford, was operating a radar gun along Route 190. At approximately 10:40 p.m., Desso observed a car operated by the defendant traveling at a rate of fifty-nine miles per hour in a thirty-five miles per hour zone. Desso pulled out behind the defendant's vehicle and activated his emergency lights and siren. The defendant traveled approximately seven-tenths of one mile before stopping his vehicle.

Desso approached the driver's side of the defendant's vehicle and detected the odor of alcohol through an open window. Desso observed that the defendant's "face seemed to be a little flushed, his speech was a little bit slurred, and his eyes were a little glossy." Desso asked the defendant for his license, registration and insurance information. According to Desso, the defendant had difficulty gathering these documents from both the glove compartment and his wallet. The defendant told Desso that he had consumed two glasses of wine at a nearby restaurant.

Desso then asked the defendant to exit the vehicle. Desso observed that the defendant had difficulty walk-

ing and that he was using the side of the car to steady himself. While instructing the defendant on certain field sobriety tests, Desso noticed that the defendant was "swaying." Desso then administered a number of field sobriety tests, including the horizontal gaze nystagmus test, the one leg stand test, and the walk and turn test, all of which the defendant failed. Desso also asked the defendant to recite the alphabet and the defendant missed three letters. Thereafter, Desso concluded that the defendant was operating his vehicle while under the influence of alcohol and, accordingly, placed the defendant under arrest. The defendant was then transported to a police station for booking. Another police officer, who observed the defendant at the station later that evening, testified that the defendant smelled of alcohol, slurred his speech and generally acted in a manner consistent with inebriation.

At the station, Desso informed the defendant of his right to refuse a breath test. With the defendant's permission, Desso began to conduct a breath test using a "Draeger Alcotest 9510" (Draeger machine). After the Draeger machine indicated that it was functioning properly, Desso took two breath samples from the defendant in accordance with the standard procedures. The first sample was taken at 11:48 p.m. and produced a reading of 0.2217. The second sample was taken at 12:07 a.m. and produced a reading of 0.2173.

The state entered into evidence, as full exhibits, documents containing the results of these samples during Desso's testimony at trial. Specifically, the state introduced exhibits 6 and 7, which consist of printed reports from the Draeger machine that pertain, respectively, to the two samples collected at the station. The state also introduced a document, marked as exhibit 4, indicating that the Draeger machine used in the present case "was evaluated and certified for use as an [e]vidential [b]reath [a]lcohol [t]est [i]nstrument." Although Desso testified that he operated the Draeger machine, he did not testify as to how it was calibrated.

The state next presented the testimony of Robert Powers, the director of the Controlled Substances Toxicology Laboratory for the Department of Emergency Services and Public Protection. Powers testified at trial that the laboratory oversees the training of instructors for breath alcohol instruments, the repairs of old instruments, and the selection of new instruments. Powers testified that alcohol slows the function of the central nervous system, causing behavioral changes and that, for example, slurred speech tends to begin when the blood alcohol content reaches 0.17. He also explained the history of breath test machines and gave an overview of how they function, the science upon which they are based, and the correlation between the breath test results and blood alcohol content. He testified about the control tests the Draeger machine performs auto-

matically, describing how the Draeger machine tests air and gas samples before and after the subject's breath test. He testified that the Draeger machine reports, which returned results indicating a blood alcohol content of 0.2217 and 0.2173, indicated that the defendant had consumed as many as eleven drinks by the time of his arrest. Powers further testified that the ratios used to correlate between the breath test results and blood alcohol content actually err in the average person's favor by tending to show a lower blood alcohol content than is actually present. Powers also testified that, accounting for the possibility that the defendant's blood breath ratio was not the same as an average person, his true blood alcohol content could have been as low as 0.17 or as high as 0.32.

On June 30, 2011, the defendant filed a "Motion in Limine Requesting Confrontation or, in the Alternative, Suppression" claiming that his rights under the confrontation clause would be violated by the admission of the Draeger machine reports.[4] On December 12, 2011, the defendant filed a second motion to suppress, claiming that the evidence resulting from his arrest should be excluded from the trial because Desso lacked authority to make a warrantless arrest. After a hearing, the court denied the defendant's motions. Trial commenced on December 15, 2011, the jury returned its verdict on December 19, 2011, and the defendant was sentenced on February 16, 2012. This appeal followed. Additional facts will be furnished as necessary.

I

The defendant contends that the trial court improperly denied his motion to suppress the Draeger machine reports. He argues that, since the state did not produce four witnesses regarding the Draeger machine and its calibration, the testimony was insufficient to meet the requirements of *Melendez-Diaz*.[5] The state maintains that the production of the two witnesses who testified at the trial were sufficient to meet the requirements of *Melendez-Diaz*. We agree with the state.

We start with the applicable standard of review. "[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct . . . ." (Internal quotation marks omitted.) *State* v. *Stenner*, 281 Conn. 742, 761, 917 A.2d 28, cert. denied, 552 U.S. 883, 123 S. Ct. 290, 169 L. Ed. 2d 139 (2007).

Prior to addressing the defendant's precise claim in this matter, it is instructive to review some recent Supreme Court decisions regarding the issues raised

by the defendant. "In *Crawford* v. *Washington*, [541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the [United States] Supreme Court substantially revised its approach to confrontation clause claims. Under *Crawford*, testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. Id., 68. In adopting this 'categorical' approach, the court overturned existing precedent that had applied an 'open-ended balancing [test]'; id., 67–68; conditioning the admissibility of out-of-court statements on a court's determination of whether the proffered statements bore 'adequate indicia of reliability.' . . . *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). Although *Crawford*'s revision of the court's confrontation clause jurisprudence is significant, its rules govern the admissibility only of certain classes of statements, namely, testimonial hearsay. In the wake of *Crawford*, therefore, the preliminary step in any confrontation clause analysis is the determination of whether the subject statements are testimonial hearsay." *State* v. *Arroyo*, 284 Conn. 597, 618, 935 A.2d 975 (2007). In *Crawford*, the United States Supreme Court held that the state trial court had improperly admitted into evidence a recorded statement that the defendant's wife had given to police during an interrogation, which had provided proof that the defendant had not stabbed the victim in self-defense, because it deprived the defendant of his sixth amendment right to confront and cross-examine the witnesses against him. *Crawford* v. *Washington*, supra, 68–69.

Two cases decided by the United States Supreme Court after *Crawford* apply the confrontation clause in the specific context of scientific evidence. In *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 310–11, the court held that "certificates" signed and sworn to by state forensics analysts, which set forth the laboratory results of the drug tests of those analysts and which were admitted into evidence in lieu of live testimony from the analysts themselves, were "testimonial" within the meaning of *Crawford*. In so concluding, the court reasoned that: (1) the certificates clearly were a sworn and solemn declaration by the analysts as to the truth of the facts asserted; (2) "under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance"; and (3) the court could "safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves." Id., 311. In *Bullcoming* v. *New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 2710, 180 L. Ed. 2d 610 (2011), the court held that the confrontation clause also does not permit the prosecution to introduce a forensic laboratory report containing a testimonial statement by an analyst, certifying to the

results of a blood alcohol concentration test he performed, through the in-court testimony of another scientist "who did not sign the certification or perform or observe the test reported in the certification."

In the present case, the defendant claims that his constitutional right of confrontation was violated when the state was permitted to present the Draeger machine reports without being required to call additional witnesses. Specifically, the defendant argues that four witnesses were required to satisfy the mandate of *Melendez-Diaz*, namely: (1) the breath test operator; (2) the calibration analyst; (3) the quality assurance specialist; and (4) the ethanol breath standard analyst. Although the defendant concedes that the state presented Desso and Powers as witnesses, he argues that the state's failure to call additional witnesses who might have information relevant to the reliability of the Draeger machine violates *Melendez-Diaz* and that, therefore, his conviction must be reversed.

The state contests the defendant's arguments on the ground that neither *Melendez-Diaz* nor *Bullcoming* requires the government to present the live testimony of all of the persons responsible for creating and maintaining the particular scientific equipment used by the analyst during those tests. Further, the state argues that data generated by a machine is neither a "statement" nor "testimonial" for the purposes of the confrontation clause. We agree with the state that neither *Melendez-Diaz* nor *Bullcoming* require every witness in the chain of custody to testify. Furthermore, although *Melendez-Diaz* did not address the issue of whether raw data constitutes testimonial evidence subject to the confrontation clause, we agree with other courts which have answered that question in the negative.

The defendant's positions were directly discussed in *Melendez-Diaz* as follows: "[C]ontrary to the dissent's suggestion . . . we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 311 n.1. The defendant claims that the United States Supreme Court only meant that the state need not present every witness in the chain of custody of a particular piece of evidence, but that the state must present every witness who might testify to the accuracy of the testing device. The court further stated in *Melendez-Diaz* that "[i]t is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony is introduced must [if the defendant objects] be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records." (Emphasis omitted.) Id., 311 n.1. This statement is noteworthy because the

state established the accuracy and reliability of the Draeger machine, by way of exhibit 4, which was admitted after the defendant expressly represented that he had no objection to the certificate's admission. Exhibit 4 established that the Draeger machine utilized in the present case was both evaluated and certified for use as an "[e]vidential [b]reath [t]est [i]nstrument." Thus, we agree with the state that, having expressly acceded to the admission of this evidence establishing the machine's accuracy in hearsay form, the defendant's claim that the mere admission of the subsequent test results from that machine precluded him from challenging the accuracy and reliability of the machine is meritless. In *Crawford*, *Melendez-Diaz* and *Bullcoming*, the witness whose absence from the trial deprived the defendant of his confrontation rights was the individual who made the inculpatory statement against the defendant. In this case, the state produced both the person who performed the test, and an expert to explain the results of the test. The live presence of these witnesses, together with the uncontested admission of exhibit 4, satisfies the requirements of *Melendez-Diaz* and *Bullcoming*.

We also note that the United States Supreme Court has not addressed the issue of whether the introduction of raw data generated by a machine falls within the confines of *Crawford* or *Melendez-Diaz*. *B*oth the majority and the concurrence in *Bullcoming* emphasized, however, that the holding of that case was limited to human statements and actions and did not necessarily apply to raw, machine produced data. See *Bullcoming* v. *New Mexico*, supra, 131 S. Ct. 2714 (emphasizing that analyst's certification as to manner in which he conducted testing "relat[es] to past events and human actions not revealed in raw, machine-produced data," that is "meet for cross-examination"); id., 2722 (Sotomayor, J., concurring) ("this is not a case in which the [s]tate introduced only machine-generated results, such as a printout from a gas chromatograph").

Other courts that have directly addressed the issue have concluded that raw data produced by a machine does not constitute a "statement" for purposes of the confrontation clause. In *United States* v. *Washington*, 498 F.3d 225, 229–30 (4th Cir. 2007), cert. denied, 557 U.S. 934, 129 S. Ct. 2856, 174 L. Ed. 2d 600 (2009), the United States Court of Appeals for the Fourth Circuit reasoned as follows: "Only testimonial statements cause the declarant to be a witness within the meaning of the [c]onfrontation [c]lause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the [c]onfrontation [c]lause. . . .

"In the case before us, the statements in question are alleged to be the assertions that [the defendant's] blood

sample contained [phencyclidine (PCP)] and alcohol. But those statements were never made by the technicians who tested the blood. The most the technicians could have said was that the printed data from their chromatograph machines showed that the blood contained PCP and alcohol. The machine printout is the only source of the statement, and *no person* viewed a blood sample and concluded that it contained PCP and alcohol. Yet, the very same data that would have permitted the lab[oratory] technicians to say that the blood contained PCP and alcohol [was] also seen and interpreted by [the toxicologist who testified at trial]. Moreover, [that] data [was] the only basis upon which [the toxicologist] stated in court that the blood sample contained PCP and alcohol. In short, the inculpating statement— that [the defendant's] blood sample contained PCP and alcohol—was made by the machine on printed sheets, which were given to [the toxicologist]. The technicians could neither have affirmed or denied independently that the blood contained PCP and alcohol because all the technicians could do was to refer to the raw data printed out by the machine. Thus, the statements to which [the toxicologist] testified in court—the blood sample contained PCP and alcohol—did not come from the out-of-court technicians, and so there was no violation of the [c]onfrontation [c]lause.

"Moreover, there would be no value in cross-examining the lab[oratory] technicians on their out-of-court statements about whether the blood sample tested positive for PCP and alcohol because they made no such statements. They would only be able to refer to the machine's printouts, which [the toxicologist] also had. The value of cross-examination might relate to authentication or to a description of the machines or to the chain of custody, but none of these were issues at trial, nor are they issues on appeal. Whether the machines properly reported PCP or alcohol is determined by the raw data that the machines generated, and its truth is dependent solely on the machine.

"Thus, we reject the characterization of the raw data generated by the lab[oratory's] machines as statements of the lab[oratory] technicians who operated the machines. The raw data generated by the diagnostic machines are the statements of the machines themselves, not their operators. But statements made by machines are not out-of-court statements made by declarants that are subject to the [c]onfrontation [c]lause." (Citation omitted; emphasis altered; internal quotation marks omitted.)

The Fourth Circuit Court of Appeals continued: "A 'statement' is defined by [rule 801 (a) of the Federal Rule of Evidence] as an '(1) oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.' . . . Obviously, the lab[-oratory] technicians made no statements of any kind,

and they did not say or write the information generated by the machines. The machines generated data by manipulating blood through a common scientific and technological process. The lab[oratory] technicians' role was simply to operate the machines. The 'statement' that [the defendant's] blood contained PCP and alcohol is a conclusion drawn only from the machines' data, and its source was independent of human observation or reporting. Only the machine, through its diagnostic and technical process, could provide facts about the chemical composition of [the defendant's] blood. Accordingly, the raw data generated by the machines were not the statements of technicians.

"Additionally, this raw data generated by the machines were not hearsay statements as implicated by the [c]onfrontation [c]lause. [Hearsay] is understood to be 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' Fed. R. Evid. 801 (c) . . . . 'A declarant is a person who makes a statement.' Fed. R. Evid. 801 (b). . . . And a 'statement,' to repeat, is an '(1) oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.' Fed. R. Evid. 801 (a) . . . . Only a person may be a declarant and make a statement. Accordingly, 'nothing "said" by a machine . . . is [hearsay].' [4 C. Mueller & L. Kirkpatrick, Federal Evidence (2nd Ed. 1994) § 380, p. 65; see also] *United States* v. *Hamilton*, 413 F.3d 1138, 1142–43 (10th Cir. 2005) (concluding that the computer-generated header information accompanying pornographic images retrieved from the Internet was not a hearsay statement because there was no 'person' acting as a declarant); *United States* v. *Khorozian*, 333 F.3d 498, 506 [3d Cir.] (concluding that an automatically generated time stamp on a fax was not a hearsay statement because it was not uttered by a [person]) [cert. denied, 540 U.S. 968, 124 S. Ct. 450, 157 L. Ed. 2d 314 (2003)]; *People* v. *Holowko*, [109 Ill. 2d 187, 191–93, 486 N.E. 2d 877] (1985) (concluding 'that the printout of results of computerized telephone tracing equipment is not hearsay evidence' but rather 'a self-generated record of its operations') . . . .

"In short, the raw data generated by the machines do not constitute 'statements' and the machines are not 'declarants.' As such, no out-of-court statement implicating the [c]onfrontation [c]lause was admitted into evidence through the testimony of [the toxicologist].

"Any concerns about the reliability of such machine-generated information is addressed through the process of authentication not by hearsay or [c]onfrontation [c]lause analysis. When information provided by machines is mainly a product of 'mechanical measurement or manipulation of data by well-accepted scientific or mathematical techniques,' 4 [C.] Mueller & [L.] Kirk-

patrick, [supra, p. 65], reliability concerns are addressed by requiring the proponent to show that the machine and its functions are reliable, that it was correctly adjusted or calibrated, and that the data (in this case, the blood) put into the machine was accurate (i.e., that the blood put into the machine was the defendant's). In other words, a foundation must be established for the information through authentication, which Federal Rule of Evidence 901 (b) (9) allows such proof to be authenticated by evidence 'describing [the] process or system used to produce [the] result' and showing it 'produces an accurate result.' But none of these concerns were issues below, nor are they issues in this appeal." (Emphasis omitted; footnotes omitted.) *United States* v. *Washington*, supra, 498 F.3d 230–31; accord *United States* v. *Lamons*, 532 F.3d 1251, 1260–65 (11th Cir.), cert. denied, 555 U.S. 1009, 129 S. Ct. 524, 172 L. Ed. 2d 384 (2008); *United States* v. *Moon*, 512 F.3d 359, 362 (7th Cir.), cert. denied, 555 U.S. 812, 129 S. Ct. 40, 172 L. Ed. 2d 19 (2008); *United States* v. *Khorozian*, supra, 333 F.3d 506; *People* v. *Lopez*, 55 Cal. 4th 569, 583, 286 P.3d 469, 147 Cal. Rptr. 3d 559 (2012), cert. denied, U.S. , 133 S. Ct. 1501, 185 L. Ed. 2d 556 (2013); *Cranston* v. *State*, 936 N.E.2d 342, 345 (Ind. App. 2010); *People* v. *Dinardo*, 290 Mich. App. 280, 290, 801 N.W.2d 73 (2010); *Luginbyhl* v. *Commonwealth*, 46 Va. App. 460, 466–68, 618 S.E.2d 347 (2005).

As in *Washington*, the defendant's claim in this appeal is purely constitutional and he does not claim that the state failed to lay a sufficient evidentiary foundation for the introduction of the Draeger machine reports. Moreover, even if such a claim had been pursued before the trial court and in the present appeal, it would have been meritless. See *United States* v. *Hamblen-Baird*, 266 F.R.D. 38, 40–41 (D. Mass. 2010). Therefore, we agree with the reasoning contained in *Washington* and the other federal courts that have addressed the issue. We hold that the machine generated data is not subject to the restrictions imposed by *Crawford*, *Melendez-Diaz* and *Bullcoming*.

Consequently, for all of the reasons stated, we agree with the state that the defendant was not denied his constitutional right of confrontation by the admission of the Draeger machine reports. Therefore, we conclude that the trial court properly denied the defendant's first motion to suppress.

## II

The defendant next claims that the trial court improperly denied his motion to suppress the evidence resulting from his arrest. In that motion, the defendant claimed that Desso did not have the authority necessary to make a warrantless arrest pursuant to General Statutes § 54-1f (a). Therefore, the defendant argued, the arrest violated his rights under the fourth amendment to the United States constitution.[6] He renews his argu-

ment in this appeal.

Some additional facts are necessary for the consideration of this claim. At the pretrial hearing on the defendant's motion to suppress the breath test results, Desso testified on direct examination that he had worked for the Stafford Police Department for twenty-eight years, during which he was a sworn police officer, that he had worked as both a patrolman and a police sergeant, that he graduated from the Connecticut State Police Academy, and that he had made approximately 100 arrests for operating under the influence over the years. On cross-examination, Desso clarified that he was a "police constable," that he was hired by the town of Stafford, which put him through municipal training, and that there is a statute that authorizes him to exercise police powers. After eliciting this evidence on cross-examination, defense counsel filed a motion to suppress "any and all evidence gathered as a result of the initial stop, arrest and detention" by Desso on the ground that Desso's appointment as a "special constable" was not done in compliance with all of the pertinent statutory requirements. During a hearing on the motion, the defendant argued that, under his reading of the pertinent statutes, Desso was not properly appointed as a constable because there were no town ordinances passed by the town of Stafford that specifically authorized the first selectman to make such an appointment. At the beginning of the state's argument in response, the trial court permitted the state to proffer exhibit 1. This exhibit, which was admitted into evidence without objection, was signed by the first selectman for the town of Stafford and expressly certified that Desso was among the three individuals appointed as special constables between October 28, 2010 and October 15, 2011. Exhibit 1 explicitly stated that Desso's appointment was made "in accordance with General Statutes § 7-92."[7] Following argument, the trial court denied the defendant's motion. The court found, inter alia, that the defendant failed to present "any conclusive proof that the town of Stafford does not have an ordinance that provides for the appointment of constables by the chief executive authority and the identification of constables as peace officers." The court expressly relied upon exhibit 1 as one basis for finding that Desso was authorized by the town of Stafford to serve as a special constable, pursuant to § 7-92. The trial court further found that Desso "was a member of a division of state police within the Department of Public Safety or an organized local police department within the meaning of General Statutes § 53a-3 and therefore he had arrest powers within the meaning of [§] 54-1f."

The defendant's claim on appeal is twofold. First, he argues that the trial court's finding that Desso was appointed as a special constable by his town's chief executive officer was clearly erroneous. Second, the defendant argues that the absence of any ordinances

in the town of Stafford expressly authorizing the first selectman to appoint a special constable rendered any such appointment void in this case. In response, the state argues that the trial court's finding that Desso was appointed as a special constable was clearly supported by the evidence. Further, the state contends that, unlike some other statutes, § 7-92 does not require that there be any supporting ordinances in order for such an appointment to be valid or in order for special constables to exercise the power of arrest. We agree with the state.

In addition to the standard of review for motions to suppress discussed previously in this opinion, the resolution of this issue involves a matter of statutory construction. "Because statutory interpretation is a question of law, our review is de novo. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *McCoy* v. *Commissioner of Public Safety*, 300 Conn. 144, 150–51, 12 A.3d 948 (2011).

We begin with the text of the relevant statutes. Section § 54-1f (a) provides in relevant part: "Peace officers, as defined in subdivision (9) of section 53a-3, in their respective precincts, shall arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the person is taken or apprehended in the act or on the speedy information of others, provided that no constable elected pursuant to the provisions of section 9-200 shall be considered a peace officer for the purposes of this subsection, unless the town in which such constable holds office provides, by ordinance, that constables shall be considered peace officers for the purpose of this subsection."[8]

General Statutes § 9-200 provides in relevant part:

"Each town shall elect, at its regular municipal election, unless otherwise provided by law and except as provided in section 9-185, not more than seven constables . . . ."

General Statutes § 9-185 provides in relevant part: "Unless otherwise provided by special act or charter . . . (6) constables . . . shall be elected, provided any town may, by ordinance, provide for the appointment, by its chief executive authority, of (A) a constable or constables in lieu of constables to be elected under section 9-200 . . . ."

Section 7-92 provides in relevant part: "The chief executive officer of any municipality may appoint such number of special constables as he or she deems necessary to preserve the public peace within such municipality, who may serve for terms of not more than two years or during any public celebration or gathering or any riot or unusual excitement, and such special officers shall have the authority of constables of such town to serve criminal process and make arrests for commission of crime. . . ."

The plain and unambiguous language of these statutes creates three types of constables. One type of constable is elected by the municipal voters pursuant to § 9-200. The second type of constable is appointed by a municipality's chief executive pursuant to § 9-185. The third type of constable, denominated as a special constable, is appointed by the municipality's chief executive officer pursuant to § 7-92.

Constables elected pursuant to § 9-200 are expressly excluded from being considered "peace officers" with arrest powers under § 54-1f (a), unless there is a specific ordinance providing otherwise. See General Statutes § 54-1f (a) ("provided that no constable elected pursuant to the provisions of section 9-200 shall be considered a peace officer for the purposes of this subsection, unless the town in which such constable holds office provides, by ordinance, that constables shall be considered peace officers for the purposes of this subsection").

Likewise, § 9-185 requires an ordinance expressly authorizing a municipality's chief executive officer to appoint constables in lieu of elections under § 9-200. See General Statutes § 9-185 ("any town may, by ordinance, provide for the appointment, by its chief executive authority, of . . . a constable or constables in lieu of constables to be elected under section 9-200").

The appointment of special constables pursuant to § 7-92, unlike the appointment of constables under § 9-185, does not require the passage of a municipal ordinance. Further, unlike constables elected pursuant to § 9-200 or appointed pursuant to § 9-185, special constables appointed pursuant to § 7-92 are not dependent upon §§ 53a-3 (9) and 54-1f as authority for their arrest

powers. Rather, § 7-92 expressly authorizes special constables to "make arrests for commission of crime." Therefore, contrary to the defendant's claims, neither the authority of a municipality's chief executive officer to appoint a special constable, nor the authority of a special constable to exercise the power of arrest once appointed, are dependent upon the enactment of a municipal ordinance. Accordingly, Desso, as a special constable appointed pursuant to § 7-92, had the power to make the arrest in the present case.[9] Therefore, we conclude that the trial court properly denied the defendant's second motion to suppress.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] General Statutes (Supp. 2014) § 14-227a (a) provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle (1) while under the influence of intoxicating liquor or any drug or both, or (2) while such person has an elevated blood alcohol content. For the purposes of this section, 'elevated blood alcohol content' means a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight . . . ." We note that the defendant's two convictions under § 14-227a were merged by the trial court.

We also note that § 14-227a has been amended by our legislature several times since the events underlying the present appeal. See, e.g., Public Acts 2013, No. 13-271, § 51. These amendments are not, however, relevant to the issues presented in this appeal. Hereinafter, all references to § 14-227a are to the version appearing in the 2014 supplement to the General Statutes.

[2] General Statutes § 14-219 provides in relevant part: "(b) Any person who operates a motor vehicle . . . (3) on any other highway at a rate of speed greater than fifty-five miles per hour but not greater than sixty miles per hour . . . shall commit an infraction . . . ."

[3] The appeal was initially filed in the Appellate Court and we transferred the matter to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] In this motion, the defendant asked the court to suppress the "results of the chemical analysis of the [d]efendant . . . ." Consequently, we treat this motion as a motion to suppress.

[5] Specifically, the defendant argues that four witnesses were required to satisfy the mandate of *Melendez-Diaz*, namely: (1) the breath test operator; (2) the calibration analyst; (3) the quality assurance specialist; and (4) the ethanol breath standard analyst.

[6] Although the defendant makes one assertion in his brief that his claim also implicates the sixth and fourteenth amendments to the United States constitution and article first, §§ 7, 8 and 9, of the Connecticut constitution, the arguments presented in his brief focus solely on the fourth amendment and whether the evidence should have been suppressed as "the fruit of an illegal search and seizure" due to Desso's allegedly questionable status as a peace officer. The defendant cites to no specific portion of the sixth amendment, the fourteenth amendment or the state constitution. Certainly, there is no meaningful discussion involving these provisions. Accordingly, we focus on the defendant's fourth amendment claim. We deem the defendant's remaining constitutional claims to be abandoned. See *State* v. *Randolph*, 284 Conn. 328, 375 n.12, 933 A.2d 1158 (2007) ("We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim." [Internal quotation marks omitted.]).

[7] General Statutes § 7-92 provides: "The chief executive officer of any municipality may appoint such number of special constables as he or she deems necessary to preserve the public peace within such municipality, who may serve for terms of not more than two years or during any public celebration or gathering or any riot or unusual excitement, and such special

officers shall have the authority of constables of such town to serve criminal process and make arrests for commission of crime. The chief executive officer may appoint special constables: (1) With limited geographical jurisdiction; or (2) who are appointed at the request of corporations, associations or businesses and are subject to such limitations, restrictions and conditions as the chief executive officer of the municipality deems appropriate, and who shall: (A) Have jurisdiction only on land controlled by such corporation, association or business; (B) be deemed for all purposes to be agents and employees of such corporation, association or business; and (C) be paid for their services by such corporation, association or business."

[8] General Statutes § 53a-3 (9) defines " '[p]eace officer' " as, inter alia, "a constable who performs criminal law enforcement duties . . . ."

[9] We also reject the defendant's argument that there was insufficient evidence for the court to conclude that Desso had been duly appointed by the executive authority. Exhibit 1, which was admitted without objection or limitation, is a certification from the first selectman for the town of Stafford that Desso was among the three individuals appointed as the town's special constables between October 28, 2010 and October 15, 2011. Exhibit 1 expressly states that Desso's appointment was made "in accordance with § 7-92." Although there appears to be some dispute between the parties whether this exhibit was marked as a full exhibit, or for identification purposes only for the purposes of the hearing, it is clear that the testimony before the court serves as a sufficient foundation for us to hold that the trial court's factual findings were not clearly erroneous.

_____